UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | Criminal No. |
| v. | § | |
| | § | |
| **HARCHARAN SINGH NARANG** | § | |
| **GURNAIB SINGH SIDHU** | § | |
| **DAYAKAR MOPARTY** | § | |
| | § | |
| | § | |
| **Defendants** | § | |

'17CR0290

INDICTMENT

THE GRAND JURY CHARGES:

General Allegations

At all times material to this Indictment, unless otherwise specified:

## THE DEFENDANTS

1.  Defendant Harcharan Singh Narang ("**NARANG**") is a medical doctor licensed to

    practice in the State of Texas. **NARANG** is an Internal Medicine practitioner who

    practiced medicine at North Cypress Clinical Associate located at 21212 Northwest

    Freeway, suite 355, Houston, Texas and at 8420 Antoine suite 102, Houston, Texas.

2.  Defendant Gurnaib Singh Sidhu ("**SIDHU**") is a medical doctor licensed to practice in

    the State of Texas. **SIDHU** is an Internal Medicine practitioner who practiced medicine at

    North Cypress Clinical Associate located at 21212 Northwest Freeway, suite 355,

    Houston, Texas and at 8420 Antoine suite 102, Houston, Tx. **SIDHU** was an employee

    of **NARANG.**

3. Defendant Dayakar Moparty ("**D. MOPARTY**") was the owner of Red Oak Hospital, a private hospital located in Houston, Texas.

## CORPORATIONS

4. **North Cypress Clinical Associates, P.A. ("North Cypress")** was a Texas Corporation that was established by **SIDHU** in July of 2010. In December of 2012, **NARANG** was added to the corporation as President and Director. North Cypress operated as a medical clinic, where **NARANG** and **SIDHU** ran their medical practice.

5. **Forever Fit Wellness Center, PLLC ("Forever Fit")** was a Texas corporation established in or around November of 2010. **NARANG's** wife, Ranjit Kaur, ("Kaur") was listed as the registered agent and owner of Forever Fit. **NARANG** was listed as the governing person for Forever Fit. Forever Fit was located inside **NARANG's** and **SIDHU's** North Cypress office.

6. **Red Oak Hospital LLC ("Red Oak")** was a private hospital established in or around February 2012. Red Oak participated with only private health care benefit programs such as Blue Cross Blue Shields (BCBS), Cigna, and Aetna. Red Oak was licensed by the state of Texas as a four-bed hospital and without a licensed outpatient facility. **D.MOPARTY** and his brother Ravi Moparty owned Red Oak.

7. **Cleveland Regional Medical Center, L.P. ("CRMC")** was a public hospital and **D. MOPARTY** was the registered agent. CRMC was located at 300 E. Crockett, Cleveland, Texas.

8. **2920 Open MRI& Digital Imaging, LLC ("2920 Open MRI")** was a corporation co-owned by **D. MOPARTY** located at 6225 FM 2920, Spring, Texas.

9. **Spring Klein Surgical Hospital LLC ("Spring Klein")** was a management corporation co-owned by **D.MOPARTY** located at 6225 FM 2920 Spring, Texas.

10. _G. Nanak II LLC ("G. Nanak)** was a corporation located at 8420 Antoine Dr. Suite 102, Houston, Texas 77088. **NARANG** was the President of G. Nanak.

11. **Only Thirteen, Inc.("Only 13")** was a corporation located at 8420 Antoine Dr. Suite 102, Houston, Texas 77088. **NARANG** was the President of Only 13.

12. **Gurdev LLC ("Gurdev")** was a corporation located at 8420 Antoine Dr. Suite 102, Houston, Texas 77088. **NARANG** was the President of Gurdev.

13. **Breton Ridge Office Condos, LLC, ("Breton Ridge")** property located at 13684 Breton Ridge. **NARANG** was the owner of Breton Ridge.

## HEALTH CARE BENEFIT PROGRAMS

14. Blue Cross Blue Shield of Texas (BCBS), Aetna Health, Inc., ("Aetna"), and Cigna Corporation ("Cigna"), (collectively, the "health care benefit programs") are private plans and contracts, affecting commerce, under which medical benefits, items and tests are provided to individuals.

15. The Federal Employees Health Benefits Program (FEHBP) is a federally-funded health benefit program provided by the federal government for federal employees, retirees, and their eligible spouses and dependent children. The U.S. Office of Personnel Management (OPM) administers the FEHBP. OPM contracts with a number of different health insurance carriers, such as BCBS and Aetna. These insurance carriers process and pay health care claims on behalf of the FEHBP.

16. Individuals who receive benefits from the health care benefit programs are referred to as "beneficiaries".

17. Health care providers that provide tests to beneficiaries are able to apply for and obtain "provider numbers" from the health care benefit programs. A health care provider who is issued a provider number is able to file claims with the health care benefit programs to obtain reimbursement for goods or tests provided to beneficiaries.

18. Payments under the health care benefit programs are often made directly to a provider of goods or tests, rather than to a beneficiary. This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits the claim to the health care benefit program for payment, either directly or through a billing company.

19. To obtain payment from insurance carriers like BCBS, Cigna, or Aetna the provider or the provider's designee was required to submit claims to the insurance carrier that included, among other things, the following information (1) the provider's unique provider indentification number, (2) the patient's name (3) the patient's diagnosis prescribed by a standardized code, (4) a description of tests rendered to the patient using standardized codes, (5) the date and location the tests were provided, and (6) the amount claimed for the payment.

20. BCBS, Aetna, and Cigna, and other health care benefit programs relied on **NARANG, SIDHU,** and **D.MOPARTY** to submit true and accurate claims.

## COUNT 1

### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. §1349)

21. Paragraphs 1 through 20 of the General Allegations section of this Indictment are re-
alleged and incorporated as though fully set forth herein.

22. From in or around May 2012 and continuing through in or around December 2014, in the
Houston Division of the Southern District of Texas, and elsewhere, the defendants

**HARCHARAN SINGH NARANG**
**GURNAIB SINGH SIDHU**
**DAYAKAR MOPARTY**

did knowingly and willfully combine, conspire, confederate and agree with other persons

known and unknown to the Grand Jury, to violate Title 18, United States Code, Section

1349, that is, to execute a scheme and artifice to defraud a health care benefit programs

affecting commerce, as defined in Title 18, United States Code, Section 24 (b) namely,

BCBS, Cigna, Aetna and other health care programs to obtain by means of materially

false and fraudulent pretenses, representations and promises, money and property owned

by, and under the custody and control of, said health care benefit program, in connection

with the delivery of and payment for health care benefits, items and tests.

## Objects of the Conspiracy

23. It was the object of the conspiracy for the co-conspirators to unlawfully enrich themselves and/or others known and unknown by submitting and/or causing to be submitted false and fraudulent claims for medical tests that were not medically necessary, not provided, or both at an entity where claims could be billed at a higher re-imbursement rate.

## Manner and Means of Conspiracy

The manner and means by which the defendants sought to accomplish the object and purpose of the conspiracy included, among others, the following:

1.  **NARANG** and **SIDHU**, were medical doctors and partners in a medical practice named North Cypress Clinical Associates ("North Cypress") located at 21212 Northwest Freeway, suite 355, Houston, Texas. **SIDHU** and Kaur (**NARANG's** wife) had signature authority on North Cypress' Amegy Bank account number xxxxx6481.

2.  Kaur was the owner of Forever Fit and **NARANG** was the registered agent for Forever Fit, a weight loss business located at the offices of North Cypress. Kaur established bank account number xxx-xx-0052 at Amegy National Bank for Forever Fit and Kaur had sole signature authority on the account.

3.  **D. MOPARTY** co-owned and operated Red Oak Hospital located at 17400 Red Oak Houston, Texas. **D. MOPARTY** had signature authority on Red Oak's Regions Bank account xxxxx6380.

4.  Red Oak allegedly subleased space at North Cypress to perform diagnostic tests for patients.

5. **SIDHU** signed an agreement with Red Oak to serve as a Medical Director for Red Oak.

6. Forever Fit sold coupons for weight loss injections on a web site named Groupon. Forever Fit customers went to North Cypress to redeem the coupons and were seen by either **NARANG** or **SIDHU.**

7. Numerous patients were told by either **NARANG** or **SIDHU** that they needed further testing in order to proceed with the weight loss treatments, which consisted of receiving vitamin b-12 injections.

8. **NARANG** and/or **SIDHU** authorized **D. MOPARTY** to bill for medical tests such as allergy tests, ultrasounds, EKGs, nerve conductions tests and vestibular testing that were not medically necessary, not provided, or both for patients seen at the North Cypress office.

9. **NARANG** and/or **SIDHU** routinely submitted paperwork to Red Oak for medically unnecessary scratch allergy tests on patients and **D.MOPARTY** would bill for the test, regardless of whether the patient was provided the test with the proper procedure or if the test was provided at all.

10. **NARANG** and/or **SIDHU** routinely submitted paperwork to Red Oak for medically unnecessary (ENG) test codes, a diagnostic test for the vestibular system. **D. MOPARTY** would bill five codes one of which was the 92546 ENG code that allegedly involved a rotating chair that did not exist at North Cypress.

11. **NARANG** and/or **SIDHU** routinely submitted paperwork to Red Oak for medically unnecessary Nerve Conduction Velocity (NCV) test codes, a diagnostic test for the nervous system. **D. MOPARTY** would bill code 95886 that allegedly involved the insertion of a needle that was not performed on patients.

12. **D.MOPARTY** billed various health care benefit programs including BCBS, Aetna, and Cigna for medical tests allegedly provided at the North Cypress office as if they were performed at Red Oak resulting in a higher reimbursement rate. Not only were the tests billed by the wrong entity, patients were also billed for medical tests that were not medically necessary, not provided, or both.

13. On some occasions, when the health care benefit program would not cover the claims submitted for a patient by Red Oak, **D.MOPARTY** would re-submit the billing to other entities associated with **D.MOPARTY**, such as Cleveland Regional Medical Center and/or 2920 Open MRI Digital Imaging, LLC.

14. Defendants **NARANG, SIDHU, D. MOPARTY** and others co-conspirators, known and unknown would submit, or cause the submission of fraudulent claims by billing for medical tests that were not necessary, not provided or both allegedly performed at North Cypress as if they were provided at Red Oak, resulting in a higher reimbursement rate.

15. From in or around May 2012 through in or around August 29, 2014, **D. MOPARTY** billed health care benefit programs such as BCBS, Aetna, Cigna and other programs approximately 20 million dollars for medical tests that were not necessary, not provided or both that were allegedly provided by **NARANG** and/or **SIDHU** at North Cypress. **D.MOPARTY** was paid at least approximately 3.2 million dollars for these medical tests.

16. After the various health care benefit programs deposited payments into either **D.MOPARTYs'** Red Oak's Region Bank account xxxxx6380, to CRMC's Green Bank account xxxxx9706 and/or to 2920 Open MRI's Wachovia Bank account xxxxx0151, **D.MOPARTY** would and did transfer the proceeds of the fraud from these entities to

Spring Klein. **D. MOPARTY** had signature authority on Spring Kleins' Green Bank account number xxxxx5506.

17. **D.MOPARTY** would and did transfer approximately 3.2 million dollars, proceeds from the fraud scheme, from Spring Klein's Green Bank account xxxxxx5506 to several accounts controlled by **NARANG** and his wife Ranjit Kaur.

18. **D. MOPARTY** would and did pay Gurdev, G. Nanak, Breton Ridge and Only 13, companies controlled by **NARANG**, approximately 1 million dollars, using checks written on Spring Kleins' Green Bank account number xxxxx5506.

19. **NARANG** had signature authority on Gurdev's Amegy Bank account number xxxxx9407, on G. Nanak's Amegy Bank account number xxxxx3026, on Only 13's Amegy Bank account number xxxxx0942 and on Breton Ridge's Amegy bank account number xxxxx9202.

20. **D. MOPARTY** would and did pay North Cypress approximately $56,000, using checks written on Spring Kleins' Green Bank account number xxxxx5506.

21. **D. MOPARTY** would and did pay Forever Fit approximately $1,395,000, using checks written on Spring Kleins' Green Bank account number xxxxxx5506.

22. **D. MOPARTY** would and did pay Ranjit Kaur approximately $640,000, using checks written on Spring Kleins' Green Bank account number xxxxx5506.

Overt Acts

23. In furtherance of the conspiracy, and to effect the objects thereof, the defendants aided and abetted by others unknown, performed and caused to be performed, among others, the overt acts set forth herein and then re-alleged and incorporated in Counts Two through Eighteen of this Indictment, in the Southern District of Texas, and elsewhere,

a. In or around August 2010, **NARANG** and **SIDHU** established the offices at North Cypress. **SIDHU** and Kaur had signature authority on North Cypress Amegy Bank account xxxxx8461.

b. In or around May 2010, **SIDHU** was employed by **NARANG** as a physician at North Cypress.

c. In or around May 2010, Kaur established bank account number xxx-xx-0052 at Amegy National Bank for Forever Fit. Kaur had sole signature authority on the account.

d. In or around November 2010, Forever Fit was established by **NARANG** and Kaur.

e. In or around August 2012, **D.MOPARTY** established bank account number xxxxxxx6380 at Regions Bank for Red Oak. **D.MOPARTY** had signature authority on the account.

f. In or around December 2012, Red Oak and North Cypress allegedly entered into a lease agreement where Red Oak would lease space out of North Cypress to perform diagnostic tests on patients of **NARANG** and **SIDHU.**

g. In or around January 2013, **SIDHU** signed a Professional Service Agreement to serve as the Medical Director for Red Oak.

h. In or around September 2012, Forever Fit sold coupons for weight loss injections on a website called Groupon and approximately 1200 customers purchased the Forever Fit coupon.

i. In or around June 2012, **NARANG** and/or **SIDHU** allegedly performed medical tests on C.S, a patient that purchased a Groupon from Forever Fit, that were not medically necessary, not provided or both.

j. From in or around January 2013 through March 2013, Red Oak billed Aetna approximately $ 61,476 for medical tests related to C.S and Aetna paid Red Oak approximately $16,608 for medical tests that were not medically necessary, not provided, or both.

k. In or around November of 2013, **NARANG** and/or **SIDHU** allegedly performed medical tests on S.C., a patient who purchased a Groupon from Forever Fit, that were not medically necessary, not provided or both.

l. From in or around November of 2013 through December of 2013, Red Oak billed BCBS approximately $127, 840 for medical tests related to S.C. and BCBS paid Red Oak approximately $ 27,797 medical tests that were not medically necessary, not provided, or both.

m. In or around February of 2013, **NARANG** and/or **SIDHU** allegedly performed medical tests on T.C., a patient who purchased a Groupon from Forever Fit, that were not medically necessary, not provided, or both.

n. In or around February of 2013, Red Oak billed Aetna approximately $45,056 for medical tests not medically necessary, not provided or both and Aetna denied all the claims submitted by Red Oak for lack of pre-certification.

o. In or around August of 2013, **D. MOPARTY** re-submitted the rejected claims for T.C. through CRMC, a company owned by **D. MOPARTY's** brothers, Ravi and Roy MoParty. CRMC billed Aetna approximately $41,000 for medical tests not medically necessary, not provided or both and Aetna paid CRMC approximately $24,715 for the medical tests.

p.  In or around January of 2013, **NARANG** and/or **SIDHU** allegedly performed medical tests on L.C., a patient who purchased a Groupon from Forever Fit, that were not medically necessary, not provided, or both.

q.  In or around January of 2013, Red Oak billed Aetna approximately $45,056 for medical tests allegedly performed on L.C. that were not medically necessary, not provided or both. Aetna denied all the claims for lack of pre-certification.

r.  In or around April of 2013, **D.MOPARTY** re-submitted the rejected claims for L.C. through 2920 Open MRI, a company owned by **D. MOPARTY**. 2920 Open MRI billed Aetna approximately $19,201 for medical tests allegedly performed on L.C. that were not medically necessary, not provided or both and Aetna paid 2920 Open MRI approximately $656.

s.  In or around summer of 2013, **NARANG** and/or **SIDHU** allegedly performed medical tests on T.A., a patient who purchased a Groupon from Forever Fit, that were not medically necessary, not provided, or both.

t.  In or around June of 2013, Red Oak billed Cigna approximately $45,036 for medical tests that were not medically necessary, not provided or both and Red Oak was paid approximately $9,983.

u.  In or around June of 2013, **NARANG** and/or **SIDHU** allegedly performed numerous tests on L.S., a patient who purchased a Groupon from Forever Fit, that were not medically necessary, not provided, or both.

v.  In or around July of 2013, Red Oak billed Cigna approximately $47,036 for medical tests performed at North Cypress that were not medically necessary, not provided or both and  Red Oak was paid by Cigna approximately $36,936 .

w. From in or around September 2012 through August 2014, **D. MOPARTY** transferred approximately $27 million dollars from Red Oak to Spring Klein through 85 checks and approximately 3.9 million dollars through electronic transfers. The 3.2 million fraud proceeds paid by health care benefit programs to **D.MOPARTY** and authorized by **NARANG** and/or **SIDHU** at North Cypress were included in these transfers.

x. From in our around September 2012 through August 2014, approximately 1.3 million dollars in funds was transferred from CRMC to Spring Klein's Green Bank account number xxxxx5506.

y. From in our around September 2012 through August 2014, approximately $208,000 dollars was transferred from 2920 Open MRI to Spring Klein's Green Bank account number xxxxx5506.

z. On or about May 10, 2013 Spring Klein issued check numbered 2724 for $30,000 deposited into North Cypress' Amegy bank account xxxxx6481.

aa. On or about November 1, 2013, Spring Klein issued check 3493 for $16,047 deposited into North Cypress' Amegy bank account xxxxx6481.

bb. On or about January 18, 2013, Spring Klein issued check 2448 for $22,000 deposited into Forever Fit's Amegy Bank account xxxxx6949.

cc. On or about July 26, 2013, Spring Klein issued check 2968 for $26,870 deposited into Forever Fit's Amegy Bank account xxxxx6949.

dd. On or about January 31, 2014, Spring Klein issued check 3712 for $25,000 deposited into Forever Fit's Amegy Bank account xxxxx6949.

ee. On or about July 24, 2014, Spring Klein issued a check numbered 4108 for $25, 451 deposited into Kaur's Amegy Bank account xxxxx2481.

ff.  On or about April 20, 2014, Spring Klein issued a check numbered 4035 for $15,000 deposited into Only 13's Amegy Bank account xxxxx0942.

gg. On or about July 19, 2013, Spring Klein issued a check numbered 2966 for $18,000 deposited into G.Nanak's Amegy Bank account xxxxx3026.

hh. On or about November 20, 2013, Spring Klein issued a check numbered 2399 for $13,500 deposited into Gurdev's Amegy Bank account xxxxx9407.

ii. On or about January 20, 2013, Spring Klein issued a check numbered 2400 for $12,500 deposited into Breton Ridge's Amegy Bank account number xxxxx9202.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO- EIGHTEEN
### Health Care Fraud
### (18 U.S.C. § 1347)

24. The factual allegations of Count One of this Indictment are re-alleged and incorporated as though fully set forth herein.

25. From in or around May 2012 and continuing through in or around December 2014, in Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**HARCHARAN SINGH NARANG**
**GURNAIB SINGH SIDHU**
**D. MOPARTY**

aided and abetted by others known and unknown, in connection with the delivery of and payment for health care benefits, items and tests , did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as

defined by Title 18, United States code, Section 24(b), namely, BCBS, Cigna, Aetna and other health care programs to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and tests.

## PURPOSE OF THE SCHEME TO DEFRAUD

It was the purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things: (a) by fraudulently inducing insurance companies to pay reimbursements for purportedly legitimate medical tests the defendants knew to be false, fictitious, fraudulent and otherwise non-reimbursable (b) causing the submission and concealment of false and fraudulent claims to insurance providers, and the receipt and transfer of proceeds from the fraud, and (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of defendants and their co-conspirators.

## EXECUTION OF THE SCHEME TO DEFRAUD

26. On or about the dates set forth as to each count below, in Houston Division of the Southern District of Texas, and elsewhere the defendants did knowingly and willfully execute a scheme to defraud a health care benefit program and to obtain by means of material, false and fraudulent pretenses, representations and promises, any of the money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items and tests, to wit: on or about the listed dates, the defendants caused to be submitted false, forged, and fraudulent claims to health care benefit programs for medical tests that were not medically necessary, not provided, or both.

In violation of Title 18, United States Code, Sections 1347 and 2.

| Count | Patient | Approximate Service Date | Health Care Program | Test Codes | Approx. Amount Billed | Approx. Amount Paid |
|---|---|---|---|---|---|---|
| 2 | C.S. | 1/3/2013 | Aetna | 93925 (Artery Doppler test x2) 93971 (Vein Doppler x2) | $28,356 | $2,356 to Red Oak Check number 081446258 |
| 3 | C.S. | 1/3/13 | Aetna | 95886 (NCV needle test) 95909 (NCV) | $14,517 | $6,967 to Red Oak Check number 090340081 |
| 4 | C.S. | 1/24/13 | Aetna | ENG test codes 92541 92542 92545 92546 92547 | $2,608 | $567 to Red Oak Check number 090217557 |
| 5 | C.S. | 3/7/13 | Aetna | 76670 (Abdominal Ultrasound) | $4,200 | $721 to Red Oak Check Number 090907400 |
| 6 | T.C. | 2/1/13 | Aetna | 93306 (Cardiac Ultrasound) 93925 (Artery Doppler) 93971 (Vein Doppler) | $41,000 | $24,715 to Cleveland Regional Medical Center Check Number 813245370002374 |
| 7 | T.A. | 6/3/13 | Cigna | ENG test codes 92541 92542 92545 92546 92547 | $6,035 | $1,757 to Red Oak Check Number 256144704 |

| 8 | T.A. | 6/3/13 | Cigna | 93306 (Cardiac Ultrasound) | $12,645 | $2,918 to Red Oak Check Number 256443303 |
|---|------|--------|-------|----------------------------|---------|------------------------------------------|
| 9 | T.A. | 6/17/13 | Cigna | 93925 (Artery Doppler) 93971 (Vein Doppler) | $28,356 | $ 5,307 to Red Oak Check Number 256587775 |
| 10 | L.C. | 1/14/13 | Aetna | 95004 (Allergy) 92547 92546 92545 92542 92541 (ENG test codes) 93971 (Vein Doppler) 93925 (Artery Doppler) 93306 (Cardiac Ultrasound) 93970 (Vein Doppler) | $19,201 | $656.06 to 2920 Open MRI & Digital Imaging, L.P. Check Number 30329324 |
| 11 | S.C. | 11/13/13 | BCBS | 93306 (Cardiac Ultrasound) | $12,644 | $1,713 to Red Oak Check Number 0032277791 |
| 12 | S.C. | 11/13/13 | BCBS | 95910 (NCV) | $13,689 | $300 to Red Oak Check Number 0032309676 |
|  |  |  |  |  |  |  |

| | | | | | | |
|---|---|---|---|---|---|---|
| 13 | S.C. | 11/13/13 | BCBS | 92541<br>92542<br>92545<br>92546<br>92547<br>(ENG codes)<br>95910<br>95886<br>(NCV codes)<br>95004<br>(Allergy) | $127,840 | $23,002 to Red Oak<br>Check Number<br>0032329951 |
| 14 | S.C. | 11/14/13 thru 12/4/13 | BCBS | 95911<br>95886<br>(NCV tests)<br>93971<br>(Vein Doppler)<br>93925<br>(Artery Doppler)<br>93880<br>(Cartoid Doppler) | $54,318 | $2,779 to Red Oak<br>Check Number<br>0032349278 |
| 15 | L.S. | 7/15/13 | Cigna | 93925<br>(Artery Doppler)<br>93971<br>(Vein Doppler) | $28,356 | $21,992 to Red Oak<br>Check Number<br>714119239 |
| 16 | L.S. | 7/15/13 | Cigna | 95004<br>(Allergy) | $1,129 | $903 to Red Oak<br>Check Number<br>714119240 |
| 17 | L.S. | 7/15/13 | Cigna | 93306<br>(Cardiac Ultrasound) | $12,644 | $10,115 to Red Oak<br>Check Number<br>714119241 |
| | | | | | | |

| 18 | L.S. | 7/15/13 | Cigna | ENG codes 92541 92542 92545 92546 92547 | $4,906 | $3,924 to Red Oak Check Number 714119242 |
|----|------|---------|-------|------|--------|------|

## COUNTS NINETEEN THROUGH TWENTY-ONE
### (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity- 18 U.S.C. § 1957)

1. The factual allegations contained in Counts 1-18 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2. On or about the dates set forth below, in Harris County, in the Southern District of Texas, and elsewhere, the defendants

### DAYAKAR MOPARTY
### HARCHARAN NARANG

aided and abetted by others, known and unknown, did knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is health care fraud in violation of Title 18, United States Code, Section 1347, as follows:

| COUNT | DEFENDANTS | DATE (On or about) | MONETARY TRANSACTION |
|---|---|---|---|
| 19 | Daykar MoParty Harcharan Narang | 1/20/2013 | Deposit of Check #2399 drawn on D.MoParty's Spring Klein Surgical Hospital Green Bank account 5506, in the amount of $13,500, payable to Harcharan Narang and Ranjit Kaur DBA Gurdev LLC account 9407 at Amegy Bank. |
| 20 | Daykar MoParty Harcharan Narang | 4/5/2013 | Deposit of Check #2614 drawn on D.Moparty's Spring Klein Surgical Hospital Green Bank account 5506, in the amount of $25,000, payable to Harcharan Narang and Ranjit Kaur DBA Only 13 Inc. account 0942 at Amegy Bank. |
| 21 | Daykar MoParty Harcharan Narang | 4/9/2013 | Deposit of Check #2689 drawn on D. Moparty's Spring Klein Surgical Hosptial Green Bank account 5506, in the amount of $24,000, payable payable to Harcharan Narang and Ranjit Kaur DBA G. Nanak Inc. Amegy Bank account 3026. |
|  |  |  |  |

In violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

The United States gives notice to defendants charged in Counts One through Eighteen:

**HARCHARAN SINGH NARANG**
**GURNAIB SINGH SIDHU**
**DAYAKAR MOPARTY**

that upon conviction of conspiracy in violation of Title 18, United States Code, Sections 1349 or of a violation of Title 18, United States Code, Section 1347, all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE
## (18 U.S.C. § 982(a)(1)

The United States gives notice to defendants charged in Counts Nineteen through Twenty-One:

**DAYAKAR MOPARTY**
**HARCHARAN SINGH NARANG**

that upon conviction of a violation of Title 18, United States Code, Section 1957, all property, real or personal, involved in the offense and all property traceable to such property, is subject to forfeiture.

## Property subject to forfeiture

The property subject to forfeiture, includes, but is not limited to, the following property:

At least $3.2 million in United States dollars.

## Money Judgment

A money judgment may be imposed against the defendants for the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable.

<u>Substitute Assets</u>

In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture.


A TRUE BILL:

ORIGINAL SIGNATURE ON FILE

FOREPERSON


ABE MARTINEZ
ACTING UNITED STATES ATTORNEY

TINA ANSARI
ASSISTANT UNITED STATES ATTORNEY