## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 4:17-CR-00290-1 |
| vs. | ) | |
| | ) | |
| HARCHARAN SINGH NARANG, *ET AL.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION
## TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN
## FEDERAL CUSTODY

Dr. HARCHARAN SINGH NARANG, pursuant to 28 U.S.C. § 2255,

respectfully moves this Court to vacate his conviction and sentence in this

case.

## I.      Relevant Procedural History

On May 17, 2017, a federal grand jury in the Southern District of Texas

returned an Indictment against Dr. Narang and his co-defendants, Dr. Gurnaib

Singh Sidhu and Mr. Dayakar Moparty, charging Dr. Narang with one count

of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349

(Count 1), eighteen counts of health care fraud in violation of 18 U.S.C. §§

1347 & 2 (Counts 2-18), and three counts of engaging in monetary transactions

in property derived from specified unlawful activities in violation of 18 U.S.C.

§§ 1957 & 2 (Counts 19-21). (Indictment, ECF No. 1.) The charges arise from

allegations that Dr. Narang and Dr. Sidhu billed certain health care benefit programs for "medical tests that were not medically necessary, not provided, or both at an entity where claims could be billed at a higher reimbursement rate." (*Id.* at 6.)

Dr. Sidhu pleaded guilty to Count 1 months before the commencement of Dr. Narang's trial. (Min. Entry, Dec. 11, 2018.)

At trial, the Government improperly introduced Dr. Sidhu's guilty plea to the jury on two occasions: during its opening argument the government stated that Dr. Sidhu "is a co-conspirator in this case" but that "Dr. Sidhu is not in this trial because he has already pled guilty." (Trial Tr. 66, ECF No. 219). Second, right before the Government rested its case it elicited improper testimony from Federal Bureau of Investigation Special Agent Kevin Lammons by asking that "we haven't talked a lot about Dr. Sidhu yet. We've heard that he was working with Dr. Narang but haven't seen him in this trial. Why is that?" (Trial Tr. 83, ECF No. 230.) Agent Lammons answered, "[h]e's already pled guilty." (*Id.*)

On February 22, 2019, the jury convicted Dr. Narang on all counts of the Indictment in which he was charged. (Verdict, ECF No. 167.)

On the sixth day of the jury trial, after the Government rested its case, the Dr. Narang moved the Court for a mistrial based on the Government's having referred to Dr. Sidhu's guilty plea, despite knowing that it was not

calling Dr. Sidhu as a witness. (Trial Tr. 220, ECF No. 230.) The court reserved its ruling on that motion. (*Id*.)

On February 26, 2019, Dr. Narang filed a written Motion for Mistrial (ECF No. 179.)

On May 14, 2019, the Court issued an Order (ECF No. 234) denying the Motion for Mistrial. Specifically, the Court found that "[t]he statements made by the government during its opening statement [] arguably had a legitimate purpose," because "[t]here is no evidence that the government did not intend to call Dr. Sidhu as a witness." (*Id*.) The Court, however, addressed Agent Lammons' reference to Dr. Sidhu's guilty plea, stating that "Agent Lammons' testimony was provided near the conclusion of the government's case-in-chief, and the government likely knew at that point that it no longer planned to call Dr. Sidhu as a witness." (*Id*. at 10.) The Court concluded that "at least one of the challenged statements weighs slightly in favor of granting Defendants' Motion." (*Id*.) Notably, the Court found the error was harmless, primarily because there was no indication that the Government introduced Dr. Sidhu's guilty plea "in bad faith." (*Id*.)

The Court sentenced Dr. Narang on November 14, 2019. (Min. Entry, Nov. 14, 2019). On November 19, 2019, the Court issued an Amended Judgment, sentencing Dr. Narang to 121 months of imprisonment, three years of supervised release, and holding him jointly and severally liable with Mr. Moparty to pay a restitution of $2,621,999.04. (Amended J., ECF No. 290.)

On November 22, 2019, Dr. Narang filed a Notice of Appeal (ECF No. 294), and on August 23, 2021, the Fifth Circuit affirmed his conviction and sentence (Judgment, ECF No. 408).

## II.  Memorandum of Law

A petitioner bears the burden of establishing the need for § 2255 relief, as well as that of showing the need for an evidentiary hearing. *Massaro v. United States*, 538 U.S. 500 (2003). A petitioner must demonstrate that any claimed error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).

### a.  The circumstances surrounding the Government's introduction of Dr. Sidhu's guilty plea denied Dr. Narang of a fundamentally fair trial, in violation of his constitutional rights to the Confrontation Clause and to Due Process.

Dr. Narang submits that the circumstances surrounding the Government's introduction of Dr. Sidhu's guilty plea denied him of his constitutional rights to the Confrontation Clause and to Due Process.

As a preliminary matter, it is critical to note that said error goes beyond a mere evidentiary issue, directly implicates a criminal defendant's constitutional rights, and constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *Addonizio*, 442 U.S. at 185. It is so because the constitutional claims pertaining to Dr. Sidhu's guilty plea must be scrutinized in its context, including the Government's bad faith prior to and

during the trial, the Government's substantial interference which precluded Dr. Narang from subpoenaing Dr. Sidhu, and the court's impermissible burden-shifting comment, as will be demonstrated herein below.

1. <u>Legal Framework</u>

    A. Confrontation Clause

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held it is automatically reversible error to admit into evidence an out of court statement by a non-testifying co-defendant in violation of the Confrontation Clause, where the witness was not unavailable and the defendant did not have a prior opportunity to cross-examine the witness. As the *Crawford* Court emphasized, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id*. at 50. "The Confrontation Clause requires that the reliability and veracity of the evidence against a criminal defendant be tested by cross-examination, not determined by a trial court." *Hemphill v. New York*, 142 S. Ct. 681, 694 (2022). The Fifth Circuit has warned that "the government must take care to avoid eliciting" unconstitutional testimonies that violate a criminal defendant's Confrontation Clause rights. *United States v. Sharp*, 6 F.4th 573, 582 (5th Cir. 2021).

To establish a Confrontation Clause violation, "the defendant need only show that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010) (internal quotation marks omitted).

More specifically, with regard to a co-defendant's guilty plea, it is well established that a defendant is "entitled to have questions of guilt on the evidence against [him], 'not on whether a government witness or a codefendant has plead guilty to the same charges.'" *United States v. Delgado*, 401 F.3d 290, 299–300 (5th Cir. 2005).

In *United States v. Hansen*, 544 F.2d 778 (5th Cir. 1977), the trial court informed the jury that Hansen's co-defendant had pleaded guilty prior to trial, purportedly in an attempt to explain his absence. The Fifth Circuit noted that the co-defendant pleaded guilty prior to trial; that there was no mention of the guilty plea in the record; and that the co-defendant did not testify. *Id.* at 780. As such, the Fifth Circuit held that "there is no need to advise the jury or its prospective members that someone not in court, not on trial, and not to be tried, has pleaded guilty." *Id.* Notably, the Fifth Circuit distinguished from cases in which a statement that a co-defendant had pleaded guilty were upheld, in that the co-defendant in those cases "disappeared from the scene *after the trial had begun*." *Id.* at 780 (emphasis added). The *Hansen* court reasoned that

6

Hansen's co-defendant pleaded guilty *before the trial commenced*. The prospective jury members never saw him as a defendant. *There was no need to explain his absence.* And if the trial court thought one was needed, a simple explanation that the case was proceeding against the arraigned defendant only and the jury should not be concerned with any other party would be appropriate. Nowhere in the record was there any evidence that the co-defendant had pleaded guilty. Indeed, McGhee never testified during Hansen's trial. We think *this is a bad practice which ought not, and must not, be followed*. Trial Courts have an abundance of resources to handle situations where the plea occurs after the jury has been exposed to the array of the multiple defendants and has likely heard the reading of an incriminating indictment embellished by the prosecutor's opening statement and perhaps testimony of government witnesses. But there is no need to advise the jury or its prospective members that some one not in court, not on trial, and not to be tried, has pleaded guilty. *The prejudice* to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant *is obvious.*

Neither fairness to those still on trial nor the efficient, intelligent administration of a criminal prosecution are served by this action.

*Id.* at 780 (emphases added). *Compare United States v. Earley*, 482 F.2d 53 (10th Cir. 1973) (sustaining the lower court where on the fifth day of trial one defendant changed his plea); *United States v. Jones*, 425 F.2d 1048 (9th Cir. 1970) (sustaining a factual explanation to the jury where three of the four defendants pleaded guilty during the trial); *Fahning v. United States*, 299 F.2d 579 (5th Cir. 1962) (where with the jury panel present but before the jury was selected, one defendant unexpectedly changed his plea).

(B) Due Process

The Supreme Court has recognized that a criminal defendant has a constitutional right to "present his own witnesses to establish a defense."

*Washington v. Texas*, 388 U.S. 14, 19 (1967). This right is an element of due process of law guaranteed the defendant by the due process clause. *See e.g., Webb v. Texas*, 409 U.S. 95 (1972); *United States v. Henricksen,* 564 F.2d 197 (5th Cir. 1977). The Supreme Court has established that the government deprives due process of law when it "*effectively dr[ives a] witness off the stand.*" *Webb v. Texas*, 409 U.S. 95, 98 (1972) (emphasis added).

"Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980). If such a due process violation occurs, the court *must reverse without regard to prejudice* to the defendant. *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979).

Circuit courts have held that various types of governmental interference can deprive a defendant of this right, including where a material witness's unavailability is attributable to unilateral and overt government action (*see United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971)), and where a defense witness was intimidated by terms of plea bargain (*see United States v. Henricksen*, 564 F.2d 197 (5th Cir. 1977)). In *Henricksen*, the defendant proceeded to trial on a drug conspiracy charge. *Id.* Prior to trial, a codefendant, whose testimony would have tended to exonerate Henricksen, plea bargained with the Government. *Id.* As part of his plea, he had to agree not to testify in any manner regarding Henricksen. *Id.* If he did testify, the Government stated the agreement would be void, and he would be tried on

all counts of the indictment. *Id.* The co-defendant refused to testify. *Id.* The Fifth Circuit vacated Henricksen's conviction, finding violations of his due process rights. *Id. See also United States v. Morrison,* 535 F.2d 223 (3rd Cir. 1976) (holding that the defendant's due process rights were violated where the prosecutor repeatedly warned the defense witness of her liability to prosecution, which "culminated in a highly intimidating personal interview" made possible by a legally invalid subpoena).

Moreover, the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). This remains a "bedrock, "axiomatic and elementary" principle." *Id*. at 363. The Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510 (1979) held that burden-shifting jury instructions on the question of intent violate the due process requirement. The prohibition protects the "fundamental value determination of our society," given voice in Justice Harlan's concurrence in *Winship*, that "it is far worse to convict an innocent man than to let a guilty man go free." 397 U.S. at 372.

The Fifth Circuit emphasized that it "do[es] not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case . . . [as] [s]uch a course of action is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence

of his innocence." *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990).

In *United States v. Bennett*, 874 F.3d 236, 251 (5th Cir. 2017), the Fifth Circuit found the prosecutor's statements during closing arguments that "nothing stops [defendants] from issuing a subpoena for the bank records they claim that the government hid from you" and that "[t]hey don't have to put on anything, but they have subpoena power" were improper comments implying that defendant had obligation to produce evidence.

A movant's claim that the trial court erred when it denied his motion for a mistrial is cognizable under federal habeas review if it alleges a due process violation. *See Duval v. Cain*, 116 Fed. App'x. 475, 476 (5th Cir. 2004).

2.  Application

Here, Dr. Narang submits that the circumstances surrounding Dr. Sidhu's guilty plea and his availability as a witness must be put back in context for purposes of carefully scrutinize the severe violations of his constitutional rights in light of the Confrontation Clause and the Due Process Clause. Critically, moreover, the confrontation clause violations and due process violations must be read together because they interacted with each other and effectively denied Dr. Narang a fair trial. In order to present a complete and clear picture of such constitutional implications, Dr. Narang demonstrates and analyzes the following relevant events in a chronological order:

(1) Dr. Sidhu pleaded guilty on December 11, 2018, more than two months before the commencement of Dr. Narang's trial. Min. Entry, Dec. 11, 2018. Since Dr. Sidhu had not "disappeared from the scene after the trial had begun," "there was [simply] no need to explain his absence" at trial. *Hansen*, 544 F.2d at 780. More importantly, any introduction of his guilty plea under the guise of explaining his absence caused "obvious" "prejudice to the remaining parties, [including Dr. Narang,] who are charged with complicity in the acts of the self-confessed guilty participant*." Id. "*Neither fairness to those still on trial nor the efficient, intelligent administration of a criminal prosecution are served by this action" and "bad practice." *Id*.

(2) Just like the defendants in *Henricksen* and *Morrison, s*ubstantial government interference with Dr. Narang's ability to present Dr. Sidhu as a witness occurred because Dr. Sidhu was intimidated by the terms of his plea bargain.

On May 17, 2017, Dr. Sidhu was originally charged with one count of health care fraud conspiracy and seventeen counts of substantive health care fraud. Indictment, ECF No. 1. He soon was released pending trial. Min. Entry, May 24, 2017.

On July 9, 2018, the Government filed a Motion to Revoke Defendant Sidhu's Appearance Bond (ECF No. 62) on grounds that, while on bond, he committed *offenses of health care fraud and arguably tax evasion in addition to the charges in this case*. *Id*. Specifically, from January, 2015 through May 11, 2018,

Medicare paid approximately $4.2 million for prescriptions written by Sidhu, $3.4 million of which was attributed to topical-cream prescriptions. *Id*. at 2. Moreover, Dr. Sidhu historically has written 11,168 prescriptions for controlled substances; in addition, he "wrote 2,268 prescriptions for controlled substances for 625 patients" while on pretrial release. *Id*. Furthermore, Dr. Sidhu made cash deposits of $302,000. *Id*. at 3.

Despite all these serious violations of law while on pretrial release, per the Government's proposed order, the Court allowed Dr. Sidhu to continue that release. Min. Entry, Sept. 13, 2018.

Subsequently, and while those additional violations of law could be prosecuted at any time, on December 11, 2018 Dr. Sidhu pleaded guilty to Count 1 in this case. Min. Entry, Dec. 11, 2018. His plea deal is more than beneficial. Specifically, the Government

- agreed for Dr. Sidhu remain on release pending sentencing *even after* it had moved to revoke that pretrial release for his multiple, serious violations (Tr. of Sidhu Re-arraignment, ECF No. 212 at 3; Ex. A, Tr. of Sidhu Deposition at 37, 113-114, 121),
- dismissed the seventeen substantive felony health care fraud charges (Counts 2–18)(Tr. of Sidhu Re-arraignment, ECF No. 212 at 13),
- promised that it would not prosecute him for any other conduct of which the Government was aware at the time he entered his guilty plea, including the new health care fraud offenses, drug dealing

offenses and tax evasion (see Ex. A, Tr. of Sidhu Deposition at 77, 98, 125-126),

- moved for a downward departure, pursuant to U.S.S.G. § 5K1.1 from the Sentencing Guidelines range (Tr. of Sidhu Re-arraignment, ECF No. 212 at 12),

- agreed to a 3-level downward adjustment if his Sentencing Guidelines range exceeds 16 points (*id*. at 13), and

- agreed that he is only responsible for approximately sixteen percent ($600,000) of the amount of loss charged ($3.2 million) (*id*.).

Inversely, Dr. Sidhu would face several consequences if he was less than fully-cooperative with the Government. (Tr. of Sidhu Re-arraignment, ECF No. 212 at 13). Specifically, since the Government had the authority to formally prosecute the additional drug distribution or "pill mill" and tax evasion charges at any time, Dr. Sidhu could have been subject to additional, multiple felony charges of distributing controlled substances in violation of 21 U.S.C. § 841, health care fraud in violation of 18 U.S.C. § 1347, and tax fraud in violation of 26 U.S.C. §§ 7201 and 7203, which could have resulted in harsh sentences. *See generally*, Mot. to Revoke Bond, ECF No. 62. This holds particularly true when considering that Dr. Sidhu's sentencing was scheduled to occur after the conclusion of Dr. Narang's trial. Order, ECF No. 100. It is also evidenced by the fact that the Government caused Dr. Sidhu's unavailability at trial in bad faith, as will be detailed herein below. While Dr.

Sidhu's plea agreement did not explicitly document such intimidations, they are real.

(3) Prior to trial, it became clear to the Government that Dr. Sidhu's testimony would undermine, as opposed to helping, the Government's case in chief.

Dr. Sidhu's prior statements and deposition clearly indicate that, if called as a witness at trial, his testimony would be favorable to Dr. Narang and would undermine the Government's case in chief. This is precisely the reason why the Government engaged in bad-faith actions to preclude Dr. Narang from the capacity of calling Dr. Sidhu as a witness.

Specifically, during his prior interviews and deposition, Dr. Sidhu stated the following which could potentially create more than a reasonable doubt to the Government's case in chief:

- Contrary to the Government's assertion that Dr. Sidhu "just follows the orders of Dr. Narang" (Trial Tr. 5, ECF No. 219), Dr. Sidhu admitted being a medical director for Red Oak Hospital and confirmed his signature on the medical director contract during his previous interview;

- Contrary to the Government's contention that Dr. Sidhu "ha[d] no incentive to order all these unnecessary tests" (Trial Tr. 219, ECF No. 219), Dr. Sidhu acknowledged during his previous interview that he would order tests as he saw medically necessary, that he would order

an echocardiogram for patients over fifty years of age, showing

edema, etc., and that he believed it was preventative medicine; he also

stated that the tests he ordered were "[w]hat [he] was thinking good

for [him]" (*see* Ex. A, Tr. of Sidhu Deposition at 87);

- Contrary to the Government's suggestion that Dr. Sidhu merely acted

  as a puppet for Dr. Narang (Trial Tr. 5, ECF No. 219), Dr. Sidhu stated

  that he ordered tests based on patients' medical conditions and

  according to his medical education as a "trained clinician" (*see* Ex. A,

  Tr. of Sidhu Deposition at 70). He stated that:

> We order few tests which is very important for the primary
> care doctors, especially echo, the VP, I've done an
> ultrasounds of jugulars, and these are the main things that
> we do for the ultrasound. If patient is diabetic and they
> complain of numbness and other things, then we do
> another study, and these are the main tests that was
> ordered, but other than that, if it's an allergy or vision or
> patient is becoming ill, they are dizzy and all this, then we
> may order the other tests.

*Id*. He also acknowledged that he was "taught in medical school that

there are certain basic things that [he] also need to do depending on the

symptoms that are being presented" and that he would "definitely" try

"[d]ifferential diagnosis" with his patients, which is "a standard that's

used by doctors taking test information to try to figure out what is

causing the symptoms that are being presented." *Id*. at 71. He even

admitted that "definitely" "ordering tests for patients is a normal and

necessary thing in medical practice." *Id*.

- Dr. Sidhu also acknowledged that there is a difference of opinion in doctors sometimes as to what is an appropriate test and what's an inappropriate test, and that "[i]t definitely depends on a different doctor," doctor's training and the doctor's experience. *Id.* at 71-72.

- Dr. Sidhu admitted that, in medical school, he was taught to order lots of tests to try to find out what is going on. *Id.* at 72.

- More specifically, contrary to the Government's contention that the scheme was "exactly" "Groupons . . . placed for weight loss shots" (Trial Tr. 5–6, ECF No. 219), Dr. Sidhu stated that Dr. Narang's practice did not solely consist of patients who had come to the Forever Fit with a groupon, and that they "were getting some other patients too" (*see* Ex. A, Tr. of Sidhu Deposition at 72). Dr. Sidhu also acknowledged that there was a normal, established practice that had nothing to do with weight loss, with which the aesthetic type of products that can be offered, such as the nutritions, the skin cream and the body beautiful type of things, and that a lot of doctors are doing the same. *Id.* at 72–73. Indeed, it was precisely "one of the things that attracted [him] to working with Dr. Narang." *Id.* at 73.

- Dr. Sidhu acknowledged that the patients were free to go wherever they wanted to go to get the tests done; if they did not want to have the tests done, that was their business. *Id.* at 74.

- When Dr. Narang's trial attorney asked about the motion to revoke bond and the pain medication prescriptions at issue therein, Dr. Sidhu admitted that his lawyer told him that the Government had "come back and they [had] complained against him . . . one was home health care, number two was medications, especially the pain medication." *Id.* at 125–126. By saying so, Dr. Sidhu effectively admitted that the non-prosecution of the additional offenses was an important part of his plea deal.

(4) It is patently obvious that "unilateral and overt government action" attributed to Dr. Sidhu's unavailability at trial. *Mendez-Rodriguez*, 450 F.2d at 1.

Having learned that Dr. Sidhu's testimony would undermine its case-in-chief, it employed a series of unilateral and overt government actions to render Dr. Sidhu unavailable at trial. The Government's bad faith in this regard becomes clear when viewing its actions collectively:

- First, prior to trial the Government moved for a deposition of Dr. Sidhu, although his medical records at that time did not reflect that his deteriorating health is such that his testimony requires a deposition to preserve it. *See* Ex. B, Dr. Narang's trial attorney's email to Assistant United States Attroney Tina Ansari, Nov. 13, 2018.

- Then, after learning from the deposition that Dr. Sidhu's testimony would undermine its case in chief, the Government left the deposition incomplete (see Ex. A, Tr. of Sidhu Depo. at 133).

- The deposition was rescheduled for the next week. On the evening before the rescheduled deposition date, however, the Government contacted Dr. Narang's trial attorney and advised that there will be no deposition as the courts were closed because of federal government shutdown, but that she would try to have the trial scheduled at the earliest possible time, assuring Dr. Narang's trial attorney that she would call Dr. Sidhu as a witness. As Dr. Narang's trial attorney asserted, "Sidhu's depo was not completed because the Prosecutor assured, first, that the depo was not finished up because of the Budget Shutdown and, second, that there was no need to start the depo back up after the Shutdown ended because Sidhu would be called at trial" (Reply to Resp. to Mot. for Mistrial 4–5, ECF No. 216).

- The Government's words quickly were belied. At the rescheduled deposition date, Dr. Narang's trial attorney learned from a court clerk or staff member that although the government was shut down, the federal criminal courts were operating at normal schedule.

- Dr. Narang's trial attorney then had a conversation with Dr. Sidhu's attorney, and learned that *the Government already had told Dr. Sidhu's attorney that it did <u>not</u> intend to bring Dr. Sidhu back for a deposition or trial*. Dr. Narang's attorney told Dr. Narang the same in early January, 2019.

- Prior to and during each day of the trial, however, the Government continued to mislead Dr. Narang's trial attorney into believing that Dr. Sidhu would testify so that Dr. Narang did not subpoena him. *See* Ex. C, AUSA Ansari's email to Dr. Narang's trial attorney, Feb. 8, 2019; *see also* Mot. for Mistrial 4, ECF No. 179 ("defense counsel believed in good faith that the Government would call Dr. Sidhu as a witness (to fulfill its promise).")

- Believing in good faith based on the Government's promise that it would call Dr. Sidhu as a witness, Dr. Narang's trial attorney did not subpoena him.

- During the trial, when the Government informed Dr. Narang's trial attorney that it would not call Dr. Sidhu as a witness, it was too late and impractical for Dr. Narang's trial attorney to subpoena Dr. Sidhu to the trial, particularly considering Dr. Sidhu's poor health.

As such, the Government's unilateral and overt actions attributed to Dr. Sidhu's unavailability at trial, and demonstrated its subtle, but undoubtedly bad faith in this regard.

(5) The Government elicited testimony regarding Dr. Sidhu's guilty plea even after it explicitly informed that it was not going to call him as a witness.

The Government improperly introduced Dr. Sidhu's guilty plea to the jury on two occasions: first, during its opening argument the government stated that Dr. Sidhu "is a co-conspirator in this case" but that "Dr. Sidhu is not

in this trial because he has already pled guilty." Trial Tr. 66, ECF No. 219.

Second, after the Government informed the defense that it was not going to

call Dr. Sidhu (*see* Ex. D, Ms. Ansari's email to Dr. Narang's trial attorney, Feb.

18, 2019) and immediately before the Government rested its case, it still

elicited improper testimony from Agent Lammons by asking that "we haven't

talked a lot about Dr. Sidhu yet. We've heard that he was working with Dr.

Narang but haven't seen him in this trial. Why is that?" Trial Tr. 83, ECF No.

230. Agent Lammons answered, "[h]e's already pled guilty." *Id*.

Dr. Narang's trial attorney immediately objected to Agent Lammons'

testimony pursuant to Fed. R. Evid. 403 and the Confrontation Clause. *Id*. at

83. The Court, upon Dr. Narang's attorney's request, instructed the jury to

disregard the testimony. *Id*. at 83–84. However, the Court rejected the

confrontation clause challenge on grounds that Dr. Narang had the ability to

subpoena Dr. Sidhu in the event that the Government did not call him as a

witness. *Id*. at 84.

In its Order denying motion for mistrial, the trial court found that

neither reference to Dr. Sidhu's guilty plea was improperly emphasized or

offered as substantive evidence, because "[b]oth references . . . were in the

context of explaining why Dr. Sidhu . . . was not present at trial," and because

"there is no indication that either of the challenged statements were made in

bad faith" as "[t]here [was] no evidence that the government did not intend to

call Dr. Sidhu as a witness." Order 6, 9, 10, ECF No. 234. While the Court noted that "the government can point to no proper purpose for Agent Lammons' testimony," the error was harmless due to the curative jury instructions and the overwhelming evidence against Dr. Narang. *Id*. at 10–11. The Fifth Circuit affirmed and adopted the district court's reasoning in this regard. *United States v. Moparty*, 11 F.4th 280, 292–294 (5th Cir. 2021).

Critically, however, the trial and appellate courts' analyses were limited to the scope of an evidentiary issue, rather than the constitutional claims raised herein.

Furthermore, as demonstrated above, both courts erred in finding that the Government's references were not improper for purposes of explaining Dr. Sidhu's absence at trial. Again, the co-defendant did not "disappear from the scene after the trial had begun;" the prosecution's reference to such co-defendant's guilty plea constitutes "a bad practice which ought not, and must not, be followed." *Hanson*, 244 F.2d at 780. "[T]here is no need to advise the jury or its prospective members that some one not in court, not on trial, and not to be tried, has pleaded guilty." *Id*. Thus, and in light of the Government's expressed intention that it was not going to call Dr. Sidhu at trial, it consciously used such references as substantive evidence against Dr. Narang, under the guise of the unnecessary, bad practice of explaining his absence. This holds particularly true when considering that Dr. Sidhu pleaded guilty to Count 1, health care fraud conspiracy, which inherently requires an illegal

agreement between at least two people, thus, unequivocally implicating Dr. Narang.

Moreover, contrary to the courts' findings that there was no indication of the Government's bad faith, such bad faith was clear as demonstrated herein above, which itself constitutes a due process violation.

Lastly, the error was not harmless when viewed under the lens of constitutional claims. As the *Hansen* court emphasized, "[t]he prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious." *Hanson*, 244 F.2d at 780. In no way could the court's limiting jury instructions cure such prejudice. More importantly, when such a due process violation occurs, the court *must reverse without regard to prejudice* to the defendant. *Hammond*, 598 F.2d at 1008.

(6) To compound the due process issues, the Government's misconduct led the court to make impermissible burden-shifting comments in front of the jury. *Sandstrom*, 442 U.S at 510.

After giving the limiting instruction, the Court questioned Dr. Narang's trial attorney in front of the jury regarding whether the instruction was sufficient as follows:

> THE COURT: Is that satisfactory?
> [TRIAL ATTORNEY]: Your Honor, I believe there was a confrontation clause problem and we can take it up after his testimony.
> THE COURT: Well, tell me about it now so I can fix it, if there's a problem.

> [TRIAL ATTORNEY]: We do not have an ability to cross-examine Dr. Sidhu. The government is not going to call Dr. Sidhu.
>
> THE COURT: *Can't you subpoena him?*
>
> [TRIAL ATTORNEY]: We were told that they were going to bring Dr. Sidhu.
>
> THE COURT: Well, you can issue a subpoena if you think his testimony is relevant. Let's move along.

Trial Tr. 84, ECF No. 230 (emphasis added). The Court's comment only compounded the harm created by the Government as it suggested to the jury that Dr. Narang had a burden in the criminal prosecution against him. *See United States v. Bennett*, 874 F.3d 236, 251 (5th Cir. 2017) (finding the prosecutor's remarks that "nothing stops [the defendants] from issuing a subpoena for the bank records they claim that the government hid from you" and that "[t]hey don't have to put on anything, but they have subpoena power" improper.)

As such, viewing these constitutional violations together, it is clear that Dr. Narang was denied his constitutional rights to the Confrontation Clause and to Due Process. The trial court erred in denying his Motion for Mistrial, and the appellate court erred in affirming the trial court's denial.

### b. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims can be brought for the first time in a motion to vacate a conviction, regardless of whether the petitioner could have raised the claim on direct appeal. *Massaro v. United States,* 538 U.S. 500 (2003).

"[T]he [Supreme Court] has recognized that 'the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). To establish ineffective assistance of counsel, the defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that the error must have prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *Strickland* is careful to discourage the application of this two-part test as a set of "mechanical rules," and instead to guide the decision making process and ultimately to focus the inquiry on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696. Further, the defendant must show that he was prejudiced by the deficiencies in his counsel's performance. *Id*.

Here, Dr. Narang submits that former defense counsel was ineffective in the following aspects:

1. <u>Failure to Subpoena Dr. Sidhu</u>

The right of the accused to subpoena witnesses is guaranteed by the Sixth Amendment and is a fundamental element of due process. *Washington v. Texas*, 388 U.S. 14, 19 (1967).

After Dr. Sidhu's deposition was left incomplete and prior to the commencement of the trial, Dr. Narang and his trial attorney discussed and agreed that Dr. Sidhu's testimony was crucial for the defense, particularly considering Dr. Sidhu's assertions in his depostion. Pre-trial, Dr. Narang urged his trial attorney to subpoena Dr. Sidhu, but Dr. Narang's trial attorney

did not do so as he believed in good faith that he would have the opportunity to cross examine Dr. Sidhu after the Government presented Dr. Sidhu as a witness. Dr. Narang's trial attorney even prepared questions for his cross-examination of Dr. Sidhu. *See* Ex. E, Cross-Examination Questions.

During the trial, after the Government first reference to Dr. Sidhu's guilty plea in its opening statement, Dr. Narang's trial attorney did not object to that reference, nor did he subpoena Dr. Sidhu.

After the second reference to Dr. Sidhu in the trial, this time by Agent Lammons, Dr. Narang's trial attorney objected to that testimony. Nonetheless, Dr. Narang's trial attorney still did not make any effort to secure Dr. Sidhu's attendance at trial, despite Dr. Narang's repeated requests to do so, even after the Court asked "[c]an't you subpoena him?" Dr. Narang's trial attorney instead elected to address the issue in a motion for a mistrial.

As a result of Dr. Narang's trial attorney's ineffectiveness, Dr. Narang was completely denied any opportunity to confront Dr. Sidhu, and to impeach the Government's witnesses who testified about Dr. Sidhu's supposedly having acted as a puppet for Dr. Narang. *See generally*, Trial Tr. Such prejudice was substantial because the Government's case-in-chief not only referenced Dr. Sidhu's guilty plea, but it also emphasized Dr. Sidhu's specific conduct while in Dr. Narang's employment. Furthermore, prior to trial, Dr. Narang's trial attorney had been aware that Dr. Sidhu's testimony would significantly undermine the Government's case, as demonstrated herein. No reasonable

attorney would have failed to subpoena such a critical witness under those circumstances. The prejudice was clear, evidenced by the trial court's reasoning that it "rejected Defendants' confrontation clause challenge because Defendants had the ability to subpoena Dr. Sidhu in the event the government did not call him as a witness." Order 3, ECF No. 234.

### 2. Failure to Call Patients as Witnesses

Prior to trial, Dr. Narang provided his trial attorney with a list of approximately ten patients whom Dr. Narang intended to call as defense witnesses. Specifically, those patients would testify that the testing was done with their consent, properly administered, and appropriate treatment plans were discussed between Dr. Narang's clinic and them. Those patients' testimonies would have constituted a critical part of Dr. Narang's defense that would have impeached (1) the Government's experts' opinions that Dr. Narang's clinic ordered medially-unnecessary tests, which were premised on only selected patient files; and, (2) the testimony of his patients that the Government presented as witnesses. No experienced trial attorney would have opted to utilize documentary evidence over favorable and unimpeachable witness testimony.

Dr. Narang's trial attorney, during his opening statement, acknowledged the Government's aforementioned strategy: "you're going to hear people that are going to make complaints about Dr. Narang's services"

and that "[the Government's] experts will render opinions . . . [based on] a small subset of the actual practice of Dr. Narang." Trial Tr. 74, 81, ECF No. 219.

However, Dr. Narang's trial attorney did not call any of Dr. Narang's patients as witnesses to rebut that then-anticipated—and later, actual—testimony of those witnesses for the Government. As a result, Dr. Narang suffered substantial prejudice as he was unable to provide an effective impeachment of, or rebuttal to, the Government's case-in-chief in this regard. No reasonable attorney would have forgone such compelling and exculpatory evidence when such evidence was readily available. Therefore, Dr. Narang's attorney's performance was ineffective.

### 3. Failure to Call an Expert Witness

There is no doubt that this case involves complex medical issues, which required medical experts to testify. This holds particularly true when considering that which Dr. Sidhu asserted at his deposition: medical providers often differ in their opinions regarding the appropriateness of certain medical tests, and "[i]t definitely depends on a different doctor," a provider's training, and the provider's experience. Ex. A, Tr. of Sidhu Deposition, at 71–72. This is also evidenced by the fact that the Government called four expert witnesses in its case-in-chief: Dr. Gans (Trial Tr. 80, ECF No. 220), Dr. Wahid (Trial Tr. 156, ECF No. 222), Dr. Grant (Trial Tr. 154, ECF No. 225), and Dr. Bungo (Trial Tr. 5, ECF No. 228).

Thus, any reasonable trial attorney would have called the defense's own

expert witness so that the jury could hear a professional, medical opinion other than that from the prosecution experts. Dr. Narang's trial attorney's failure to call even a single defense expert witness certainly undermined the defense's case and severely prejudiced Dr. Narang. Had counsel called defense expert to testify, the outcome of the trial likely would have been different.

The prejudice that Dr. Narang suffered is demonstrated by the testimony of Dr. Ashok Kadambi, an expert witness, who testified on behalf of Dr. Narang at sentencing. Dr. Kadambi is a board certified internist and endocrinologist, who has a private practice in Indiana, and whose major area of interest is bioidentical hormone replacement therapy. Sentencing Tr. 9, ECF No. 318. In late summer or early fall of 2019, Dr. Narang retained another attorney to replace his trial attorney, who requested Dr. Kadambi to review Dr. Narang's patient files for the purpose of evaluating the medical necessity or clinical appropriateness of the the various diagnostic tests Dr. Narang ordered. *Id.* After a careful review of approximately 300 patient files (*id.* at 13), Dr. Kadambi testified as follows:

- Dr. Narang has a "a proactive practice," which means preventing a client from getting a medical issue, rather than waiting for the problem to happen and then try to fix it. *Id.* at 11.

- Being an internist and focusing on weight loss and age management, Dr. Narang took a proactive approach. *Id.* at 11. Thus, "the tests that

are being ordered are assessing problems before they arise." *Id*. at 15-16.

- Dr. Kadambi strongly opined that "*in all the cases that I reviewed, I did not find any instance where a particular test was not indicated or was not necessary*." *Id*. at 13 (emphasis added).

- More specifically, Dr. Kadambi prepared a summary chart, identifying the justification for each patient's tests. *Id*. at 14.

- The allergy tests that Dr. Narang was ordering were primarily food allergy tests, because certain food allergies are very intricately tied to weight issues. *Id*. at 16.

- Before prescribing an amphetamine for purposes of weight loss treatment, "[i]t's absolutely vital" to assess the person's vascular conditions. For example, even for a marathon runner seeking weight management, there is a common condition called hypertrophic cardiomyopathy, which a doctor would "completely miss it" "unless tested with EKG and echo." *Id*. at 17–18.

However, at sentencing, Dr. Kadambi testified only as an expert regarding the issue of loss (*id*. at 7), although his opinion would have directly undermined the Government's case at trial. Had this expert testimony and opinion been offered at trial, the outcome of this case likely would have been different because Dr. Kadambi's expert opinion goes related directly to the primary issue of intent to defraud.

4.  <u>Failure to Sufficiently and Effectively Cross-Examine Agent Lammons</u>

The Government's primary witness, Agent Lammons, testified about the investigation at trial. Prior to trial, Dr. Narang informed his trial attorney that Agent Lammons' colleague, Agent Christopher Ray, who also was involved in the investigation of this case, is the husband of Dr. Kelly Englund, Dr. Narang's partner at North Cypress Regional Medical Center. Dr. Narang also informed his trial attorney that the investigation began as a result of Dr. Narang's testifying on behalf of Aetna, an insurance company, against North Cypress Regional Medical Center in a civil cause of action. Thus, Dr. Narang asked his trial attorney to cross-examine Agent Lammons on this topic for impeachment purposes. However, despite Dr. Narang's repeated requests, his trial attorney refused, causing substantial prejudice to Dr. Narang. Had Dr. Narang's trial attorney done so, the outcome of this case likely would have been different because such background information certainly would add reasonable doubt concerning the Government's case.

In summary, particularly considering the cumulative prejudicial effect of Dr. Narang's trial attorney's deficient performance, Dr. Narang was denied effective assistance of counsel at his trial.

Additionally, should this Court find any claims raised in the instant motion and memorandum procedurally defaulted, Dr. Narang submits that the reason would be the result of his trial and appellate attorneys' failures to

raise them at the first available opportunity, and the prejudice aspect of this particular ineffectiveness claim clearly would be shown by any finding of procedural default.

### c. Prosecutorial Misconduct

"Prosecutorial misconduct has been a widespread and widely criticized problem in the U.S. criminal justice system for decades." *See U.S. v. Dicus*, 579 F. Supp. 2d 1142 (N.D. Iowa, 2008), citing Sonja Starr, *Sentence Reduction as a Remedy for Prosecutorial Misconduct*, at 4 & 1, Georgetown Law Journal, 97 Geo. L.J. 1509. To establish prosecutorial misconduct, the defendant must show that: (1) the prosecutor engaged in improper conduct; and, (2) the prosecutor's improper conduct affected the defendant's substantial right. *United States v. Winters*, 530 Fed. App'x 390, 399 (5th Cir. 2013). Importantly, prosecutorial misconduct may constitute a violation of a defendant's constitutional rights to Due Process. *See Santobello v. New York*, 404 U.S. 257 (1971).

Here, Dr. Narang submits that the Government engaged in improper conduct in this case, which individually or collectively affected his substantial rights.

### 1. Prosecutorial Misconduct Pertaining to Dr. Sidhu's Guilty Plea

As demonstrated herein above, the Government's misconduct in this regard include (1) substantial government interference with Dr. Narang's ability to present Dr. Sidhu as a witness occurred because Dr. Sidhu was intimidated by the terms of his plea bargain, (2) unilateral and overt

government action attributing to Dr. Sidhu's unavailability at trial, (3) bad

faith expression to the defense that it will call Dr. Sidhu as a witness at trial,

thus precluding the defense from subpoenaing Dr. Sidhu, and, (4) consciously

eliciting testimony regarding Dr. Sidhu's guilty plea even after it explicitly

informed that it was not going to call him as a witness. Dr. Narang

incorporates by reference the relevant argument as stated herein above in

support of the instant prosecutorial misconduct claim.

Viewing this identified misconduct collectively, it is clear that Dr.

Narang's substantial constitutional rights pursuant to the Confrontation

Clause and to Due Process Clause were severely impacted. Thus, the

prosecutorial misconducts rise up to the level of a due process violation.

2.  Improper Comment Connecting Dr. Narang with "Russians"

As the Fifth Circuit summarized, prosecutorial statements may violate

due process in two ways:

> First, prosecutorial statements may implicate "a specific provision
> of the Bill of Rights" incorporated into the fourteenth amendment
> by the due process clause. Second, if prosecutorial statements do
> not implicate any such other incorporated constitutional right,
> they may constitute "a denial of due process" generally;
> sometimes called a "generic substantive due process" violation.

*Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988).

Here, Dr. Narang submits that the Government's improper comments

connecting him with "Russians" not only implicated a specific provision of

the Bill of Rights, also denied him of due process; thus constituting

prosecutorial misconduct. Specifically, at sentencing the prosecutor commented that "the reason we got hold of Dr. Narang in the first place was because back in 2008 he was dealing with the Russians." Sentencing Tr. 48, ECF No. 318.

Such ambiguous assertion that Dr. Narang "was dealing with the Russians" implicated his freedom of assembly guaranteed by First Amendment to the United States Constitution, which ensures people can gather and meet, both publicly and privately. Moreover, such improper comment, which had no relevance with the instant matter, certainly added another layer of prejudice on top of the existing denial of due process as demonstrated herein above.

### D.  Cumulative Error

Cumulative error may stand as an independent basis for habeas corpus relief when "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.' " *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).

Should this Court find that each of the above specified claim did not justify a relief pursuant to 28 U.S.C. § 2255, Dr. Narang submits that the cumulative effect of those severe errors, taken together, violated his right to due process and caused his trial and sentencing to be fundamentally unfair.

## III.    Conclusion

Dr. Narang prays, based on the foregoing assertions and argument, that

this Court vacate his conviction and sentence.

Date:        January 2, 2023

Respectfully Submitted,

***s/ Joshua Sabert Lowther, Esq.***
Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
jlowther@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com

Attorney-in-Charge for Petitioner
Harcharan Singh Narang

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 4:17-CR-00290-1 |
| vs. | ) | |
| | ) | |
| HARCHARAN SINGH NARANG, *ET AL.* | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I certify that on January 2, 2023, I electronically filed the foregoing

MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR

CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY with the

Clerk of the United States District Court for the Southern District of Texas by

way of the CM/ECF system, which automatically will serve this document on

the attorneys of record for the parties in this case by electronic mail.

Date:          January 2, 2023

Respectfully Submitted,

**_s/ Joshua Sabert Lowther, Esq._**
Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
jlowther@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com